**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 25-1821
_____

In re: PATRICK LEE OLSON,
Debtor

MICHAEL WILEY, successor by assignment to
MCGRATH TECHNICAL STAFFING, INC. d/b/a
MCGRATH SYSTEMS,

v.

PATRICK LEE OLSON,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(B.C. No. 22-ap-00058)
(D.C. No. 2:24-cv-02237)
Bankruptcy Judge: Honorable Derek J. Baker
District Judge: Honorable John F. Murphy

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
February 9, 2026

Before: CHAGARES, *Chief Judge*, SCIRICA[*] and RENDELL, *Circuit Judges*.

(Filed: August 3, 2026)

_____

[*] The Honorable Anthony J. Scirica was unavailable to participate in the decision in this case after submission to the merits panel. This opinion is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d) and 3d Cir. I.O.P. 12.1(b).

OPINION**

PER CURIAM

Appellant Patrick Olson convinced Michael Wiley to provide him with funds for a business opportunity that never came to fruition. To secure the release of these funds, Olson fabricated a contract bearing a forged signature. When the deal stalled, Wiley demanded Olson execute a promissory note guaranteeing repayment of the funds originally lent, plus Wiley's expected profits. Olson executed and then defaulted on this note, resulting in Wiley's company, McGrath Technical Staffing, securing a nearly $3.7 million default judgment against Olson's company, Idea IT Solutions.

The scheme drove both parties into bankruptcy. Wiley initially assessed the value of his ownership stake in McGrath at $1 in part because he and his bank predicted the default judgment was probably uncollectable. Wiley then had McGrath assign the default judgment to himself and initiated an adversary proceeding in Olson's bankruptcy, contending the default judgment was nondischargeable under 11 U.S.C. §§ 523(a)(2) and (a)(4) because the underlying funds were procured by fraud. The Bankruptcy Court ruled for Wiley, and the District Court for the Eastern District of Pennsylvania affirmed.

On appeal, Olson contends his obligation to pay Wiley's expected profits does not arise from his initial fraud, and that Wiley's reliance on Olson's misrepresentations was

** This disposition is not an opinion of the full Court and pursuant to 3d Cir. I.O.P. 5.7 does not constitute binding precedent.

2

not justifiable because Wiley should have discovered Olson's scheme in the months between the initial transaction and the execution of the note. He also contends the District Court should have estopped Wiley from asserting his right to a default judgment that he previously claimed was worthless. For the reasons discussed, we will affirm.

I.

Patrick Olson owned Idea IT Solutions, LLC ("Idea IT"), a value-added reseller of enterprise software and provider of data storage and processing hardware. Michael Wiley owned McGrath Technical Staffing ("McGrath"), a general staffing business. Olson and Wiley developed a business relationship: Wiley, through McGrath, would provide funding so that Olson and Idea IT could purchase hardware for his clients; Olson would then perform the installation, and Olson and Wiley would share in the proceeds. One such deal was to provide equipment for a company called Common Securitization Solutions, LLC ("CSS"). Wiley agreed to provide $577,000 for the CSS deal through a line of credit from McGrath's bank, Centric Bank.

As a condition of releasing funds for the CSS deal, Centric Bank required a signed contract to be assigned to it as security. But the contemplated CSS deal never materialized, so Olson fabricated a contract between Idea IT and CSS, bearing a forged signature purporting to be that of CSS's Chief Operating Officer. As the project stalled, Wiley demanded that Olson execute a promissory note in the amount of $3,687,000, comprising $577,000 in principal for the CSS deal, a $2,426,000 "premium payment" representing Wiley's anticipated profits, and $684,000 in outstanding payments from prior deals.

3

Olson executed the note, which obligated Idea IT (and Olson as guarantor) to pay monthly installments of $40,000. Idea IT made just one payment before defaulting.

In 2018, McGrath sued Olson and Idea IT in Pennsylvania court and was awarded a $3,678,122.58 default judgment. During discovery, Wiley uncovered the forged contract and notified Centric Bank, as well as the local police. Olson was convicted of criminal forgery and ordered to pay $1,042,258.87 in restitution.

Wiley and McGrath filed for bankruptcy in 2020. Wiley estimated the value of his 100% ownership stake in McGrath at a nominal $1 because McGrath's liabilities outstripped its assets by nearly $6 million. In McGrath's bankruptcy, Wiley assessed the default judgment's liquidation value at $0 because he and Centric Bank had deemed it probably uncollectable. In November 2021, Wiley had McGrath assign the default judgment to himself.

In 2022, Olson filed for bankruptcy. Wiley initiated the instant adversary proceeding in Olson's bankruptcy, seeking a determination that the default judgment is nondischargeable. The Bankruptcy Court held an evidentiary trial in August of 2023. In an opinion and order dated May 10, 2024, the Bankruptcy Court held that $3,003,000 of the default judgment—representing the $577,000 of principal for the CSS deal and $2,426,000 in premium payments—was nondischargeable. The District Court affirmed. Olson timely appealed.

## II.

This case was properly referred to a bankruptcy judge pursuant to 28 U.S.C. §§ 157(a) and (b)(2)(I). The District Court had jurisdiction under

4

28 U.S.C. § 158. We have jurisdiction under 28 U.S.C. § 158(d).

## III.

A creditor bears the burden of proving nondischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). In a bankruptcy appeal, we "exercise the same standard of review as the District Court in reviewing the Bankruptcy Court's determinations . . . review[ing] a bankruptcy court's legal determinations *de novo*, its factual findings for clear error, and its exercises of discretion for abuse thereof." *In re Miller*, 730 F.3d 198, 203 (3d Cir. 2013) (quotation marks & citation omitted).

The interpretation of 11 U.S.C. § 523(a)(2)(A) is a matter of law and therefore reviewed de novo. Refusal to apply judicial estoppel is an exercise of discretion, *see In re Kane*, 628 F.3d 631, 638 (3d Cir. 2010), and should therefore be upheld unless it was "founded on an error of law or a misapplication of law to the facts," *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 780 (3d Cir. 2001) (quotation marks omitted).

## IV.

## A.

Olson first contends the District Court erred in its interpretation of 11 U.S.C. § 523(a)(2)(A), which excepts from discharge "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." On appeal, Olson does not contest that the principal of $577,000 was obtained by fraud. However, he

contends the premium payments are dischargeable because "[t]here is absolutely no nexus" between them and the fraudulently obtained principal. Appellant Br. 14. And he takes exception to the District Court's reliance on *Cohen v. de la Cruz*, 523 U.S. 213 (1998), which held that "§ 523(a)(2)(A) prevents the discharge of all liability arising from fraud." *Id.* at 215. According to Olson, *Cohen* is factually distinguishable: it considered whether § 523(a)(2)(A)'s sweep includes the award of statutorily authorized punitive damages. The premium payments, by contrast, are a mere contractual obligation. By concluding that this case is controlled by *Cohen*, the District Court treated his contractual commitment as *de facto* punitive damages, without any statutory authority to do so.

Olson is correct that *Cohen* addressed the dischargeability of statutorily prescribed punitive damages, but the rule it pronounces is not limited to those facts. Indeed, *Cohen* consciously articulated a broad holding that transcends the case's factual circumstances: "We hold that § 523(a)(2)(A) prevents the discharge of *all* liability arising from fraud, *and* that an award of treble damages therefore falls within the scope of the exception." *Id.* at 215 (emphases added). The conjunction "and" signals that both parts of this bifurcated holding must have independent meaning. Olson's attempt to confine *Cohen* to its facts would effectively erase the first half of the holding which would be incompatible with the Court's framing. We give *Cohen* its most natural reading: § 523(a)(2)(A) reaches all liability for money, property, services or credit arising from fraud, statutory or otherwise.

Because *Cohen* controls this dispute, the only question is whether Olson's liability for the premium payments "aris[es] from fraud," which it does. *Id.* His fabrication of the

6

CSS deal led Wiley to borrow and commit hundreds of thousands of dollars in anticipation of a significant profit. When the deal stalled, Wiley demanded a guarantee that those profits would materialize, and Olson gave that guarantee. None of that would have happened if not for Olson's initial fraudulent misrepresentation. Therefore, § 523(a)(2)(A) plainly reaches the premium payments.

B.

Olson next faults the District Court for its failure to consider whether Wiley was still acting in justifiable reliance on Olson's misrepresentations at the time that the promissory note was struck, an omission he describes as even "[m]ore significant" than its supposed misinterpretation of *Cohen*. Appellant Br. 17. He contends Wiley knew, or would have discovered through the exercise of reasonable diligence, that the venture was failing by the time the promissory note was executed. Therefore, Wiley could not have justifiably relied on Olson's misrepresentations when the note was struck, and Olson's liability for the premium payments provided therein should not be imputed to his original fraud. Rather, in Olson's telling, the premium payments represented a "speculative business risk" that Wiley entered into not as a victim, but as an active and clear-eyed participant. Appellant Br. 19.

True, the District Court did not address this argument, but only because Olson never presented it, and therefore forfeited it. Olson's brief in the District Court notes that justifiable reliance is a prerequisite for invoking § 523(a)(2)(A). *See* Olson Dist. Ct. Br. 15, *Wiley v. Olson*, 2:24-cv-2237-JFM, ECF No. 4 (July 22, 2024) (citing *In re Ritter*, 404 B.R. 811, 822 (Bankr. E.D. Pa. 2009)). But Olson never asserted that Wiley failed to

7

satisfy this element. "To preserve a matter for appellate review, a party must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits." *Garza v. Citigroup Inc.*, 881 F.3d 277, 284 (3d Cir. 2018) (quotation marks omitted); *see also In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 262 (3d Cir. 2009) ("A fleeting reference or vague allusion to an issue will not suffice to preserve it for appeal.")

"[F]orfeited arguments in civil cases are reviewable—but only in 'truly exceptional circumstances.'" *Harbor Bus. Compliance Corp. v. Firstbase.io, Inc.*, 152 F.4th 516, 529 (3d Cir. 2025) (quoting *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 147 (3d Cir. 2017)). There is nothing "exceptional" here that warrants the unusual step of reviewing a forfeited argument, so we will not do so.[1]

## C.

Finally, Olson contends both the Bankruptcy Court and District Court erred by refusing to apply judicial estoppel. Specifically, he takes exception to Wiley previously

---

[1] We note, however, that in determining Wiley's reliance on Olson's original misrepresentations was justified, the Bankruptcy Court found "the Parties had been doing business together for some time, Mr. Wiley testified that he had been mostly satisfied with the deals he had done with the Debtor, and Mr. Wiley had no reason to believe the Debtor would commit criminal forgery in connection with a deal." App. 42. Against these strong indicia of justifiable reliance, Olson raises only one factor to distinguish the parties' original deal and the promissory note: the passage of time. And, as Wiley testified, Olson "repeatedly advised" Wiley during those intervening months that "multiple . . . issues . . . were preventing" the CSS project from closing, creating the appearance that the deal was merely delayed rather than fabricated. App. 30. Considering the entire record, this Court would be hard-pressed to reverse on the thin basis that Olson now belatedly urges, even if the argument were not forfeited.

claiming that McGrath was worth just $1 and that the default judgment it held was worthless, only to then assign the judgment to himself and pursue an order of nondischargeability.

Judicial estoppel is appropriate where a party has taken "irreconcilably inconsistent" positions and done so in bad faith, i.e. "to play fast and loose with the court." *Montrose*, 243 F.3d at 779 (quotation marks omitted). Olson's argument for judicial estoppel falters on the first requirement. Wiley testified at trial that McGrath's liabilities exceeded its assets by nearly $6 million, far more than the denomination of the default judgment. Therefore, even if Wiley and Centric Bank had assessed— counterfactually—that the judgment was certainly collectible and therefore worth its full nominal value, it would not have been unreasonable (let alone inconsistent) for Wiley to value his ownership interest in McGrath at $1. In actual fact, Wiley assessed the value of the default judgment at $0 based on his belief, backed up by Centric Bank's determination, that the judgment was uncollectable. But even so, there is no logical incompatibility between believing that an asset has no liquidation value and maintaining that one is nonetheless entitled by law to retain it. Wiley's pursuit of a nondischargeability determination is not "irreconcilably inconsistent" with his earlier valuations either of McGrath or the default judgment. *Id.*

V.

For the foregoing reasons, we will affirm the District Court's determination of nondischargeability.

9